SECOND DIVISION
Opinion filed March 8, 2011
Modified upon denial of rehearing April 5, 2011

No. 1-10-0880 (consolidated with No. 1-10-1707)

| | | |
|---|---|---|
| RILEY ACQUISITIONS, INC., | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant and Cross-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 2003 L 11577 |
| | ) | |
| MARY ELLEN DREXLER, f/k/a Mary Ellen Brown, | ) | Honorable |
| | ) | Susan McDunn, |
| | ) | Judge Presiding. |
| Defendant-Appellee, Cross-Appellant, and Third-Party Plaintiff-Appellant | ) | |
| | ) | |
| (C.C.S. Chicago Recreation, Inc., | ) | |
| | ) | |
| Third-Party Defendant-Appellee). | ) | |

JUSTICE CONNORS delivered the judgment of the court, with opinion.
Justices Karnezis and Harris concur in the judgment and opinion.

**OPINION**

This appeal follows a jury trial on claims related to breach of a guaranty contract. Plaintiff Riley Acquisitions, Inc., appeals the trial court's order directing a verdict in favor of defendant Mary Ellen Drexler after the close of evidence. Defendant cross-appeals orders of the trial court denying her motion for sanctions against plaintiff under Illinois Supreme Court Rule 137 (eff. Feb. 1, 1994), denying in part her petition for costs, and dismissing her third-party complaint against third-party defendant C.C.S. Chicago Recreation, Inc. We affirm.

I. BACKGROUND

During the early 1990s, defendant Mary Ellen Drexler and her then-husband, Steven Brown, owned and operated two companies, C.C.S. Chicago Recreation, Inc. (CCS), and

No. 1-10-0880 (consolidated with No. 1-10-1707)

Custom Frame & Poster Manufacturing, Inc. (Custom Frame). In February 1990, defendant and Brown jointly entered into a guaranty contract with Devon Bank. Under the contract, Devon agreed to extend credit to CCS and Custom Frame in exchange for defendant's and Brown's personal guaranty of the underlying promissory notes. Pursuant to this agreement, over the next several years Devon loaned money to CCS and Custom Frame through a series of promissory notes.

By 1993, however, defendant's marriage with Brown unraveled, and they initiated divorce proceedings and began disentangling their business relationships. In August 1993, defendant sent a letter to Devon that purported to revoke her personal guaranty on CCS and Custom Frame's debt to Devon. About that time, CCS and Custom Frame began to have trouble meeting their payments on the loan and defaulted. However, in September 1993, CCS and Custom Frame signed a new promissory note with Devon. The account was later made current, but by early 1994, CCS and Custom Frame had again fallen behind on payments and Devon accelerated the loan.

During this same time, defendant had taken all control of Custom Frame while Brown had assumed complete control of CCS. Custom Frame dissolved at some point in 1994, but CCS remained in existence under the control of Brown. Although Devon had moved to accelerate the loan, it did not file suit to collect on the debt from CCS, Custom Frame, Brown, or defendant. Instead, in 1994, Devon foreclosed on property that had been put up as collateral in order to secure the note. The foreclosure sale did not completely cover the outstanding debt, leaving a deficiency of several thousand dollars.

Brown's obligation as guarantor was later terminated during bankruptcy proceedings. With the dissolution of Custom Frame in 1994, this left CCS as the only principal on the note

and defendant as the sole guarantor. In 2001, CCS initiated a declaratory judgment suit against Devon regarding liability for property taxes on the foreclosed property. This suit was settled sometime in 2003. As part of the settlement agreement, Devon released CCS from its obligations under the note.

It is around this time that plaintiff became involved. Larry Starkman, who owns and operates plaintiff, was a long-time friend and business partner of Brown. At some point around the time of CCS' settlement agreement with Devon, Brown mentioned to Starkman that Devon still held the guaranty contract that defendant was party to. Brown told Starkman that Devon had recently suffered a reduction in its income and might be interested in selling its interest in the guaranty at a bargain price. Starkman looked into the matter and, through plaintiff, purchased Devon's interest in the guaranty contract. Devon duly assigned all of its rights in the guaranty contract to plaintiff.

In late 2003, plaintiff, in its capacity as assignee of Devon, brought suit against defendant for breach of the guaranty contract in order to collect the remaining deficiency on the note. In her answer to the complaint, defendant raised several affirmative defenses, including the statute of limitations and discharge. Defendant argued that her August 1993 letter to Devon that purported to revoke her personal guaranty started the running of the 10-year statute of limitations for the written guaranty contract or, alternatively, that the maturation of the note at the beginning of September 1993 began the limitations period. Either way, defendant argued that plaintiff's lawsuit was untimely because it was filed after the limitations period had run. Defendant's discharge defense was based on the theory that she was not liable on the guaranty contract because Custom Frame had been dissolved and CCS had been released.

3

No. 1-10-0880 (consolidated with No. 1-10-1707)

In 2004, defendant filed a third-party complaint against CCS, which she later amended after trial. Defendant claimed that CCS, as principal on the note, was liable to her for any and all attorney fees and costs that she incurred while defending against the breach of guaranty contract action.

The case proceeded to a jury trial in late 2009. After the close of evidence, the trial court directed a verdict in favor of defendant on the basis of both her statute of limitations defense and her discharge defense. Defendant immediately filed a motion for sanctions against plaintiff under Illinois Supreme Court Rule 137 (eff. Feb. 1, 1994), asserting that plaintiff knew or should have known that its claims were barred at the time it filed its complaint against defendant.

After plaintiff filed a motion to reconsider, the trial court affirmed the directed verdict in favor of defendant but *sua sponte* modified its order to reflect only the ground of the statute of limitations defense. The trial court later slightly modified this order again when defendant filed a motion to reconsider the *sua sponte* modification of the original order, but the trial court changed only the reasoning underlying its judgment based on the statute of limitations defense. That same day, the trial court denied defendant's motion for sanctions.

Defendant filed a petition for costs under section 5-109 of the Code of Civil Procedure (735 ILCS 5/5-109 (West 2008)), seeking to recoup expenditures on filing fees, subpoena fees, courier fees, photocopying, court reporters, and legal research costs. The trial court granted defendant's petition as to the filing and subpoena fees, but denied it as to the remaining costs.

Finally, in response to a motion by CCS, the trial court dismissed defendant's third-party complaint under section 2-615 of the Code of Civil Procedure (735 ILCS 5/2-615 (West 2008)). With all issues in the case now resolved, plaintiff timely filed a notice of appeal on the directed

4

No. 1-10-0880 (consolidated with No. 1-10-1707)

verdict issue, and defendant timely filed a notice of cross appeal on the sanctions, costs, and third-party complaint issues. This case is now before us.

## II. ANALYSIS

This appeal presents four issues that we will consider in turn: (1) whether defendant was entitled to a directed verdict, (2) whether plaintiff should be sanctioned under Supreme Court Rule 137, (3) whether plaintiff is entitled to costs, and (4) whether defendant's third-party complaint against CCS should have been dismissed.

### A. Directed Verdict

The primary issue before us on appeal is whether defendant was entitled to a directed verdict following the close of evidence in the jury trial. "A motion for [a] directed verdict will not be granted unless all of the evidence so overwhelmingly favors the movant that no contrary verdict based on that evidence could ever stand. [Citation.] On review, all of the evidence must be construed in the light most favorable to the nonmoving party." *Krywin v. Chicago Transit Authority*, 238 Ill. 2d 215, 225 (2010). We review an order granting a directed verdict *de novo*. See *id.*

The trial court's initial basis for the directed verdict was both defendant's statute of limitations defense and her defense of discharge. However, the trial court *sua sponte* modified its order to reflect only the statute of limitations ground because it believed that the evidence showed that only CCS had been discharged from its obligations on the note, rather than both CCS and Custom. As we will explain, the trial court was correct in its initial ruling on the discharge issue.

Under Illinois law, "the liability of a guarantor is limited by and is no greater than that of

5

No. 1-10-0880 (consolidated with No. 1-10-1707)

the principal debtor and *** if no recovery could be had against the principal debtor, the guarantor would also be absolved of liability." (Internal quotation marks omitted.) *Edens Plaza Bank v. Demos*, 277 Ill. App. 3d 201, 209 (1995) (quoting *Hensler v. Busey Bank*, 231 Ill. App. 3d 920, 927 (1992)). "Although the language of a guaranty agreement ultimately determines a specific guarantor's liability, the general rule is that discharge, satisfaction, or extinction of the principal obligation also ends the liability of the guarantor." (Internal quotation marks omitted.) *Id.* (quoting *Palen v. Cullom Capital Woodworking, Inc.*, 154 Ill. App. 3d 685, 687 (1987)). Accordingly, determining whether defendant has been absolved of her obligations as guarantor requires a two-step analysis. We first must determine whether the underlying obligations of the principal have been discharged or otherwise terminated. If the principal's obligations have been terminated, then we must examine the guaranty contract to determine whether the principal's discharge also functions as a discharge of the guarantor.

There were originally two principal debtors on the note underlying the guaranty contract: CCS and Custom Frame. The evidence presented at trial was that CCS was released from its obligations under the note as part of the settlement agreement with Devon, and the parties do not dispute this on appeal. Rather, the key point of contention on appeal for this issue is whether Custom Frame was also released or otherwise discharged from its obligations. The trial court reversed itself because it believed that there had been no evidence presented at trial regarding Custom Frame's obligation on the note. The trial court reasoned that, because at least one of the principals was still liable on the note, defendant could not have been absolved of liability under the guaranty contract.

However, the trial court was mistaken on this evidentiary point: Brown testified at trial

6

No. 1-10-0880 (consolidated with No. 1-10-1707)

that Custom Frame had been dissolved in 1994. Although there was no evidence that Custom Frame had ever been formally released from the note by Devon, Brown's testimony about Custom Frame's dissolution was never contradicted or impeached in any way. The question consequently becomes whether Custom Frame's dissolution terminated its liability as a principal on the note.

This situation is covered by section 12.80 of the Business Corporation Act of 1983 (805 ILCS 5/12.80 (West 2002)), which is often called the Survival Statute. Under the Survival Statute, any action against or on behalf of a corporation that has dissolved must be commenced before the end of a so-called survival period, which ends five years after the date of the corporation's dissolution. See 805 ILCS 5/12.80 (West 2002). Importantly, section 12.80 not only deals with the time period for filing claims involving dissolved corporations (see *Kleinwort Benson North America, Inc. v. Quantum Financial Services, Inc.*, 181 Ill. 2d 214, 222 (1998)), but it also limits the dissolved corporation's rights and liabilities (see *Pielet v. Pielet*, Nos. 2-09-0210, 2-09-0242 cons., slip op. at 28 (Ill. App. Nov. 29, 2010)). As *Pielet* summarized:

"A corporation's debts (and rights) extend into the survival period [citation]; *** the policy favoring satisfaction of a dissolved corporation's outstanding debts is the very reason for the Survival Statute. Thus, since the corporation's debts and obligations persist into the survival period, and since the corporation continues to exist during the survival period, a corporation or its creditors may assert claims regarding those debts and obligations during the survival period. However, once the survival period has ended, the corporation ceases to exist. Since the corporation at that point no longer exists, it can no

7

> longer be subject to any claim, and any claims not raised against or by the
>
> corporation become forfeited." *Pielet*, slip op. at 32-33.

Applying section 12.80 to the facts here, Custom Frame's obligations on the note terminated in 1999, five years after its dissolution in 1994 and long before the instant action was filed in 2003. After that date, any liability that Custom Frame may have had on the note ceased by operation of law under section 12.80.

CCS and Custom Frame were the only principal debtors on the note. Custom Frame's liability on the note ended in 1999, and CCS' liability ended when it was released by Devon Bank pursuant to the settlement agreement. With no principals remaining liable on the note, defendant would ordinarily be absolved of her liability as guarantor. See *Edens Plaza*, 277 Ill. App. 3d at 209.

This takes us to the second prong of our analysis. Even though no principals remain on the note, defendant may still be liable if the guaranty contract expressly provides for continuing liability in this situation. *Cf. Edens Plaza*, 277 Ill. App. 3d at 211-14 (Greiman, J., dissenting) (discussing modification of the general rule by express language of a guaranty contract). However, our analysis must be guided by the well-established principle that a guarantor "is a favorite of the law. [Citation.] A guarantor is to be accorded the benefit of any doubt which may arise from the language of the contract, and his liability is not to be varied or extended by construction or implication beyond its precise terms. [Citation.] The liability of a guarantor is strictly construed in his favor and against the party in whose favor the guaranty runs. [Citation.]" *Hensler v. Busey Bank*, 231 Ill. App. 3d 920, 926-27 (1992). General rules of contract construction apply to guaranty contracts, and "[w]here the language of a contract is

8

unequivocal, it must be carried out according to its language." *McLean County Bank v. Brokaw*, 119 Ill. 2d 405, 412 (1988); see also *Cohen v. Continental Illinois National Bank & Trust Co. of Chicago*, 248 Ill. App. 3d 188, 192 (1993) ("The meaning of a guaranty agreement is a matter of law to be determined by the court.").

The guaranty contract here contains an express liability clause, which states that defendant "guarantee[s] the full and prompt payment *** of any and all *indebtedness, liabilities, and obligations* *** of [CCS and Custom Frame] to [Devon Bank]."  (Emphasis added.)  Reading this language strictly in the guarantor's favor, its plain meaning is that defendant contracted only to be liable as guarantor for CCS' and Custom Frame's obligations on the note and nothing more.  Under the plain language of the liability clause, defendant is only liable on the guaranty contract when the principals have an obligation on the note, which is consistent with the general rule of guarantor liability.  See *Edens Plaza*, 277 Ill. App. 3d at 209.  Yet neither Custom Frame nor CCS has any obligations on the note because of their respective dissolution and release, meaning that the liability clause does not impose any liability on defendant as guarantor.

There are no other clauses in the contract that change this reading.  The only potentially contradictory clauses are two reservation-of-rights clauses.  One clause states that "liability hereunder shall in no wise be affected or impaired by (and [Devon Bank] is expressly authorized to make from time to time, without notice to anyone) any sale, pledge, surrender, compromise, release *** of any of said indebtedness, liabilities and obligations."  The other clause states that "[i]n case of the death, dissolution, liquidation, failure *** all of said indebtedness, liabilities, and obligations *** shall, at the option of [Devon Bank], become immediately due from and be

9

forthwith paid by the undersigned."

However, we do not read these clauses to mean that the guarantor is liable to pay the note even when the principal is not. Defendant's liability under the guaranty contract is expressly limited by the liability clause to be coextensive with the liability of the principals, and it is unreasonable to assume that a guarantor would consent to be liable when the principal is not without expressly stating so. See *Cohen*, 248 Ill. App. 3d at 192 ("A guarantor is not liable for anything to which he did not agree."). Moreover, it is unreasonable to read the reservation-of-rights clauses to expand the guarantor's liability beyond that expressly stated in the liability clause because they appear in a boilerplate section of the guaranty contract that reserves numerous rights to the bank. See *City National Bank of Hoopston v. Russell*, 246 Ill. App. 3d 302, 311 (1993) ("[G]uaranty agreements are strictly construed in favor of the guarantor, especially where the guaranty is on a printed form supplied by the creditor."); *Cohen*, 248 Ill. App. 3d at 192 ("Even where there are broad statements of guarantor liability, an unambiguous contract must be enforced as written.").

Notably, the second reservation-of-rights clause, which relates to the dissolution of a principal, again refers to a principal's "indebtedness, liabilities and obligations" under the note but does not account for a situation in which the principal's obligations are extinguished by operation of law under the Survival Statute. Reading this clause in the light most favorable to the guarantor, this clause means that a guarantor will remain liable on the note in the event of the principal's dissolution, but only so long as the principal itself remains obligated on the note. When the principal's obligation is extinguished at the end of the survival period following its dissolution, the guarantor's obligation is also extinguished in line with the general rule. Had the

parties wished to modify the general rule in order to ensure that the guarantor remained liable beyond the survival period in the event of the dissolution of a principal, then presumably they would have explicitly stated so in the guaranty contract.

Under these circumstances, the reservation-of-rights clauses do not make the guarantor liable even when the principal is not. Rather, we read these clauses to merely allow the creditor latitude to negotiate or otherwise deal with the note in the ordinary course of business without compromising its ability to hold defendant liable as guarantor in the event of a default on the note by the principal, so long as the principal remains obligated on the note.

In sum, the uncontradicted evidence presented at trial established that both of the principals on the note, CCS and Custom Frame, were not liable on the note. Defendant is consequently not liable under the contract of guaranty and a directed verdict in her favor was therefore proper. Although the trial court ultimately based the directed verdict on defendant's statute of limitations defense, we are "not bound to accept the reasons given by a circuit court for its judgment and the judgment may be sustained upon any ground warranted, regardless of whether the circuit court relied upon such ground and regardless of whether the reason given by the circuit court was correct." *Messenger v. Edgar*, 157 Ill. 2d 162, 177 (1993). Accordingly, we affirm the directed verdict on the ground of discharge and do not reach the alternative ground of the statute of limitations.

## B. Third-Party Complaint

We next examine the dismissal of the third-party complaint. Defendant's amended third-party complaint against CCS alleged three separate counts, only two of which are before us on appeal. Count I alleged that, if defendant were to be found liable on the guaranty contract to

11

No. 1-10-0880 (consolidated with No. 1-10-1707)

plaintiff or if defendant successfully defended against plaintiff's claims but incurred attorney fees and costs, then CCS is liable to defendant under a theory of implied contractual indemnity. Count III alleged that CCS is liable for defendant's attorney fees and costs under a theory of breach of fiduciary duty. Although defendant's third-party complaint did not describe the theories of recovery behind her allegations against CCS quite so concisely, her briefs on appeal specifically advance those two theories in order to support her claims.

The trial court dismissed defendant's third-party complaint in response to CCS' motion to dismiss under section 2-615 of the Code of Civil Procedure (735 ILCS 5/2-615 (West 2008)). We review *de novo* an order of dismissal under section 2-615. See *Aguilar v. Safeway Insurance Co.*, 221 Ill. App. 3d 1095, 1100-01 (1991). Our task on review is to "determine whether the allegations of the complaint, when interpreted in the light most favorable to the plaintiff, are sufficient to set forth a cause of action on which relief may be granted." *Id.* "A cause of action should not be dismissed on the pleadings unless it clearly appears that no set of facts could be proved which would entitle the plaintiff to recover." *Id.* at 1101. " 'We take as true all well-pled facts and reasonable inferences therefrom and consider only those facts in the pleading and included in the attached exhibits.' " *University Professionals of Illinois v. Stukel*, 344 Ill. App. 3d 856, 857 (2003) (quoting *Safeway Insurance Co. v. Daddono*, 334 Ill. App. 3d 215, 218 (2002)).

We first consider the implied contractual indemnity count. "Implied indemnity is 'a contract implied in law arising from the legal obligation of an indemnitee *** to satisfy liability caused by actions of his indemnitor.' [Citation.] The fundamental premise underlying an action for implied indemnity is the recognition that the law may impose liability upon a blameless party

12

derivatively through another's conduct. [Citation.]" *Industrial Color, Inc. v. C P Inorganics, Inc.*, 244 Ill. App. 3d 436, 439 (1993). The principle behind the theory of implied contractual indemnity is that, "where one party's breach of contract causes a second party to breach a separate contract with a third party, the second party may shift its contractual liability to the first party. [Citation.] Indemnity is justified in such instances because a party who breaches a contract can be held liable for damages which naturally arise from the breach, provided that such damages were reasonably within the contemplation of the parties as a probable result of the breach." *Zielinski v. Miller*, 277 Ill. App. 3d 735, 740 (1995).

Here, defendant alleged that she is entitled to recover from CCS (1) any damages that she may be liable to plaintiff for in the event that plaintiff prevailed in its guaranty action against her, or alternatively (2) her attorney fees and costs in the event that she successfully defends against plaintiff's action. Given that defendant prevailed against plaintiff at trial, she has no claim to indemnification from CCS for the first type of recovery because she has no liability to plaintiff on the guaranty contract.

Moreover, defendant is not entitled to indemnification from CCS for her attorney fees and costs, regardless of whether she had prevailed against plaintiff in the guaranty case. Illinois law has long been clear that "absent a statute or a contractual agreement 'attorney fees and the ordinary expenses and burdens of litigation are not allowable to the successful party.' " *Kerns v. Engelke*, 76 Ill. 2d 154, 166 (1979) (quoting *Ritter v. Ritter*, 381 Ill. 549, 553 (1943)). This is true even in an indemnification action against a third party. See *Industrial Color*, 244 Ill. App. 3d at 439-40.

Defendant attempts to avoid the application of this long-standing rule by characterizing

13

her attorney fees and costs as damages that she incurred as a result of CCS' breach of its obligations on the note. Yet this specific argument on similar facts was addressed and rejected by the supreme court in *Kerns*. See *Kerns*, 76 Ill. 2d at 166-67 ("The appellate court distinguished the instant case from *Ritter* and the general proposition above in that the attorney's fees here were the result of defending a prior action which gave rise to the indemnity claim. *** We are not persuaded we should create an indemnity exception to the *Ritter* holding even under the circumstances of this case ***."). Pursuant to *Kerns*, defendant here cannot recover her attorney fees and costs from CCS under a theory of indemnification, and consequently the trial court properly dismissed this count of her third-party complaint.

We next consider the breach of fiduciary duty count. In essence, this count alleges that CCS, as the principal on the note, had a duty to defendant, as the guarantor on the note, not to default. By CCS' default and breach of this duty, the count alleges, defendant incurred damages in the form of attorney fees and costs because she was forced to defend against plaintiff's lawsuit on the guaranty contract. The count further alleges that CCS breached some unspecified duty by entering into the settlement agreement with Devon Bank and securing a release of its own obligations under the note.

We are aware of no authority that imputes a fiduciary relationship as a matter of law between a principal debtor and a guarantor merely because of their relative positions in relation to a debt, and defendant offers none. But see *Schrager v. North Community Bank*, 328 Ill. App. 3d 696, 707 (2002) (recognizing that, although there is no fiduciary duty as a matter of law between a creditor and a guarantor, a fiduciary relationship may be found depending on the factual circumstances). Instead, defendant offers two novel theories to support this count.

14

First, defendant argues that, because CCS was owned in whole by Brown, who was defendant's husband at the time, it somehow owed her a fiduciary duty. Defendant cites no authority for this highly original theory other than the proposition that a fiduciary relationship may exist between spouses, though not based on the sole fact of the marital relationship. See, *e.g.*, *Nessler v. Nessler*, 387 Ill. App. 3d 1103, 1111 (2008). The problem with defendant's argument is that even if we assume that such a fiduciary relationship between defendant and Brown existed, then defendant would, at best, have a cause of action for breach against Brown, not CCS. Moreover, even if we were to accept for the sake of argument that such a fiduciary relationship with Brown could support a cause of action against CCS, nowhere does defendant's amended third-party complaint allege that defendant and Brown were married at the time this alleged duty arose. Without such an allegation, this theory is fatally flawed. See *University Professionals*, 344 Ill. App. 3d at 857.

Second, defendant advances the alternative theory that a fiduciary duty arose because of the guaranty contract. However, the general rule of law is that "[p]arties to a contract are not each other's fiduciaries." *Mid-West Energy Consultants, Inc. v. Covenent Home, Inc.*, 352 Ill. App. 3d 160, 164 (2004). While defendant correctly points out that it is possible for a fiduciary relationship to arise as a matter of fact between parties to a contract (see *Carey Electric Contracting, Inc. v. First National Bank of Elgin*, 74 Ill. App. 3d 233, 237-38 (1979)), nowhere does the third-party complaint allege that there was a contract between CCS and defendant. The only contracts that the complaint alleges are the note between CCS and Devon Bank, and the guaranty between defendant and Devon Bank. As with defendant's first theory, this theory is also fatally flawed and cannot support a cause of action against CCS. See *University*

15

*Professionals*, 344 Ill. App. 3d at 857-858.

Because defendant did not state a viable cause of action in her third-party complaint, we affirm the circuit court's order dismissing the third-party complaint under section 2-615 of the Code of Civil Procedure (735 ILCS 5/2-615 (West 2008)).

### C.  Sanctions

Defendant next contends that the trial court erred by denying her motion for sanctions under Illinois Supreme Court Rule 137 (eff. Feb. 1, 1994).  Rule 137 authorizes the trial court to impose sanctions on attorneys or parties who file false or frivolous pleadings.  See Ill. S. Ct. R. 137 (eff. Feb. 1, 1994).  "The decision whether to impose sanctions under Rule 137 is committed to the sound discretion of the circuit judge, and that decision will not be overturned unless it represents an abuse of discretion."  *Dowd & Dowd, Ltd. v. Gleason*, 181 Ill. 2d 460, 487 (1998).  "An abuse of discretion occurs when no reasonable person would rule as the circuit court ruled."  *Aguirre v. City of Chicago*, 382 Ill. App. 3d 89, 98 (2008).

The trial court did not abuse its discretion in denying defendant's motion for sanctions.  Defendant filed her motion for sanctions after the trial court entered the directed verdict in her favor.  Her motion was primarily based on the argument that plaintiff either was fully aware when it first filed the lawsuit or was later put on notice that its cause of action against defendant was barred by the statute of limitations and defendant's discharge.  The trial court disagreed with this position and, during an extensive discussion that takes up 13 transcript pages in the record, the trial court found that the fact that defendant's affirmative defenses of discharge and statute of limitations were ultimately successful after a jury trial did not necessarily mean that plaintiff should be subject to sanctions for pursuing its claim.  In particular, several factual points

16

surrounding the defenses were unclear and heavily contested by the parties, and they were not resolved until the trial itself. The trial court carefully considered all of the arguments in favor of sanctions that defendant raised in her motion and supporting memoranda, including the long and contentious history of this case, but ultimately declined to impose sanctions. We cannot say that the trial court abused its discretion in doing so.

### D. Costs

Finally, defendant asserts that the trial court erred by only granting in part her petition for costs under section 5-109 of the Code of Civil Procedure (735 ILCS 5/5-109 (West 2008)). We review a trial court's order on a petition for costs for abuse of discretion. See *Myers v. Bash*, 334 Ill. App. 3d 369, 371 (2002).

Defendant's petition sought reimbursement for filing fees, subpoena fees, courier fees, photocopying, court reporters, and legal research costs. The trial court granted defendant's petition for the filing and subpoena fees, but denied it as to the remaining items. Section 5-109 does not define which costs are recoverable, but the supreme court has interpreted the same term in section 5-108 of the Code of Civil Procedure (735 ILCS 5/5-108 (West 2008)), which is section 5-109's companion section and deals with recovery of costs by plaintiffs, to mean "court costs" such filing fees, subpoena fees, and statutory witness fees. See *Vicencio v. Lincoln-Way Builders, Inc.*, 204 Ill. 2d 295, 302 (2003). This definition was applied to section 5-109 by the appellate court in *Burmac v. Metal Finishing Co. v. West Bend Mutual Insurance* Co., 356 Ill. App. 3d 471, 485-86 (2005). The costs that the trial court awarded to defendant consequently fall within the category of costs contemplated by section 5-109.

However, there is some disagreement over whether the remaining costs that defendant

sought fall within section 5-109. Although *Burmac* went on to additionally hold that court reporter fees are recoverable as court costs under section 5-109 (*Burmac*, 356 Ill. App. 3d at 486), the court in *Kehoe v. Wildman, Harrold, Allen & Dixon*, 387 Ill. App. 3d 454, 471-72 (2008), found the opposite and expressly disagreed with *Burmac* on that point. *Kehoe* relied on the supreme court's admonition in *Vicencio*: "The statutes allowing recovery of costs are in derogation of the common law. Thus, it has long been said that they must be narrowly construed [citation], and that only those costs specifically designated by statute may be taxed as costs [citation]." *Vicencio*, 204 Ill. 2d at 300; see *Kehoe*, 387 Ill. App. 3d at 471-72.

Although defendant cites several cases in support of her position that copying, courier, and research fees are recoverable costs under section 5-109, these cases were either decided before *Vicencio*, deal with recovery of costs under other statutes, or are unpublished cases from other jurisdictions. See, *e.g.*, *Johnson v. Thomas*, 342 Ill. App. 3d 382 (2003); *Harris Trust & Savings Bank v. American National Bank & Trust Co.*, 230 Ill. App. 3d 591 (1992); *Goyal v. Gas Technology Institute*, 2009 U.S. LEXIS 110869, at *27-28 (N.D. Ill. Nov. 24, 2009) (citing *Johnson*), *aff'd in part and vacated in part*, 389 Fed. App'x 539 (7th Cir. 2010). Although *Johnson* was decided three months after *Vicencio*, it does not discuss *Vicencio* or the definition of costs in this context. None of the cases that defendant relies upon sheds any light on recovery of these types of costs under section 5-109.

Regardless, we do not take a position on whether or not the remaining costs that defendant sought are in fact taxable under section 5-109 because the trial court did not assess those costs in this case. The only question that is properly before us on this appeal is whether the trial court abused its discretion in denying defendant's petition as to those costs. Given the

disagreement in our case law over the extent of taxable costs under section 5-109 beyond filing, subpoena, and witness fees, the circuit court did not abuse its discretion by limiting defendant's costs recovery to only those items explicitly discussed in *Vicencio*.

### III.  CONCLUSION

For the reasons discussed above, we affirm the directed verdict in favor of defendant. We also affirm the trial court's orders denying defendant's motion for sanctions, granting in part and denying in part defendant's petition for costs, and dismissing defendant's third-party complaint.

Affirmed.